RIEMER BROS., INC., Plaintiff-Appellee, *v.* MARLIS CONSTRUCTION CO., Defendant-Appellant.

Second District (2nd Division) No. 75-182

Opinion filed April 21, 1976.

Ray W. Fick, Jr., of Herrick, McNeill, McElroy & Peregrine, of Chicago, for appellant.

David A. Decker, of Waukegan, for appellee.

Mr. JUSTICE RECHENMACHER delivered the opinion of the court:

This appeal involves· the construction of a contract for bringing in, grading and compacting fill at the site of a real estate development. The dispute is as to the amount owed by Marlis, the land developer, to Riemer, the earth moving contractor, based on the following language: "Import, grade and compact clay fill $2.75 cu. yd."

The question at issue is whether this meant payment of $2.75 per cubic yard for each cubic yard *brought* to the site (as the plaintiff contends) or $2.75 for each cubic yard as measured *after the earth was graded and compacted* at the site (as the defendant contends). After a bench trial the court awarded the plaintiff an additional payment of $20,809.25 over and above the amount tendered by the defendant.

In this appeal the defendant, Marlis, contends (1) the language of the contract was ambiguous and the court erred in not allowing extrinsic evidence to explain its meaning, (2) even if the contract was not ambiguous the plaintiff did not sustain his burden of proof as to the amount of fill he brought into the site, hence there was no proper basis for the judgment.

Marlis owned other land adjacent to the site in question and originally it had been the intention to obtain the necessary fill from this adjacent "borrow" site. In preparing the specifications in connection with what is designated on their blueprint as "mass earth work sheet" the land survey engineers, Murry and Moody, estimated the quantities of fill "available" at the adjacent site for borrowing and made a notation on the drawing, "Note: Shrinkage factor used 20% for type C and 5% for Type G." We are concerned here only with Type C fill.

However, upon examination of the fill at the adjacent site it was decided that it was not of suitable quality and it would be necessary to import fill from another location not owned by Marlis. Accordingly, a contract was made with Riemer to obtain clay fill from another source, deliver it to the site, grade it and compact it. When the first few truckloads of fill were brought into the site the load tickets were checked by a Marlis employee stationed at the site for that purpose. However, Riemer's field superintendent objected and advised the Marlis employee that it was useless to check the individual load tickets because it had been agreed between Marlis and Riemer that the method of arriving at the total amount of fill brought in would be by cross-sectioning the fill after it was in place. (That is, by measuring the elevation of the site before the fill was placed there and then measuring the elevation after the fill was placed at the site and multiplying by the area of the filled site to arrive at the number of cubic yards of fill brought in to the site.) From the testimony it appears that the Marlis employee reported this conversation to his superior and thereafter the checking of the load tickets was discontinued.

After the fill was in place, graded and compacted, it was measured and it measured 33,264 cubic yards (by stipulation, after some discrepancies were resolved between the parties' engineers). Riemer contended that he was entitled to add 20% to this total for shrinkage allowance to arrive at the actual amount of fill brought in. He construed the notation appearing on the drawing of the land survey engineers as being part of the contract and as allowing an additional 20% to be added to the volume of the measured fill, after compacting. The court agreed and gave judgment on that basis. (Actually, the additional amount allowed appears to have been based on a total of 39,917 cubic yards—33,264 plus 20%, less an amount which had already been tendered by Marlis. However, in effect, the judgment was based on the additional volume resulting from the 20% shrinkage allowance.) In a pretrial conference both counsel had indicated they thought the language "Import, grade and compact clay fill $2.75 cu. yd." was unambiguous. The court agreed and accordingly ruled that no extrinsic evidence could be introduced to explain the intent of that language. The result was that when the court construed the language to mean that $2.75 should be paid for each cubic yard *brought* to the site, before grading and compacting, the defendant was precluded from bringing in extrinsic evidence to show the custom in the trade in order to explain the intent of this language.

In this appeal the defendant contends (1) the discussion at the pretrial conference did not foreclose him from objecting to the court's interpretation as a matter of law and that such interpretation is clearly erroneous as it is against the literal language of the contract, (2) even if the language is not to be interpreted in favor of the defendant, it is at least

ambiguous and therefore extrinsic evidence should be allowed into evidence to aid in its construction, and (3) even conceding that the language is unambiguous and that it should be construed as the plaintiff contends, the court erred in granting a judgment based on a 20% increase in the actual measured fill at the site, because there was no competent evidence to sustain such judgment as to the amount of fill actually brought to the site.

While relying on the notation appearing on the land surveyor's drawing indicating he was entitled to a 20% shrinkage factor, Riemer also testified that he kept a record of the number of truckloads he brought to the site and they had totaled some 3,200 truckloads. He also made an "educated guess" as to the average number of cubic yards per truckload and arrived at an average of 14 cubic yards per truckload. He testified that on this basis he would have brought some 47,000 cubic yards of fill to the site. The court considered this as an alternative method of proof as to the quantity of fill brought to the site.

It appears to us that even if we concede that the language of the contract is unambiguous, thus not open to construction with the aid of extrinsic evidence, there is nevertheless a serious question as to whether there was an evidentiary basis for the judgment. The plaintiff not only had to prove the contract and his performance of it, but also how much fill he brought to the site, since the amount due him depended on this. Inasmuch as the uncontradicted testimony was that Riemer's field superintendent had discouraged checking the truckloads of fill brought to the site and had informed Marlis' employee, and through him the Marlis management, that Riemer was construing the contract as requiring the measurement of the fill to be by cross-sectioning, it would be dubious enough, in any event, to allow Riemer to later bring in evidence as to the number of truckloads of fill he used to establish the quantity. But such evidence is even more dubious when based on (a) an estimate of the amount of fill on each truck or an estimate of the "average" load and (b) only a spot check of one out of every three or four trucks, as was the testimony. Moreover, there was testimony that Riemer was taking fill from the same source for another, unrelated project, and the possibility of confusion in the count of some 3,200 truckloads when the trucks were going from the same location to two different sites is very apparent. Actually Riemer offered no evidence on this point—the truck tickets were never introduced into evidence and his testimony was entirely based on his own personal recollection of the facts. This possible error in the count is emphasized by the discrepancy between Riemer's truckload count and the quantity of fill actually calculated when it was measured at the site. While the engineers for the two parties differed, even on a stipulated basis, they only came up with a total of 33,264 cubic yards of fill by cross-sectioning. Conrad

Riemer's testimony was that the total number of cubic yards brought to the site would have been 47,768 based on 14 cubic yards per truck. This would amount to a shrinkage of 14,500 cubic yards due to compacting which would be some 34%. Riemer's explanation of the discrepancy was that 20% was not a high enough shrinkage factor. However, Marlis' expert was of the opinion that in some cases even 20% would be excessive and that it was impossible to calculate the shrinkage factor in soil at one site by reference to another, unrelated site. He testified that actually the discrepancy could vary from a shrinkage factor of 20% to a "swell" factor of 10% depending upon the material itself, but that it would not be possible for 47,000 cubic yards of fill to be compacted to 33,000 cubic yards unless it involved organic material such as peat. The fill in this case was clay. Such evidence appears to us to have questionable probative value in attempting to determine the number of loads brought in.

The primary basis of proof in establishing the plaintiff's entitlement to the additional 20% payment was apparently the notation on the soil engineer's drawing: "Shrinkage factor used, 20%." However, this related to an entirely different source of fill than was actually used. Moreover, it was at most merely a communication between Marlis and his soil engineer and there was no evidence that it was in any way a part of the contract between Marlis and Riemer or that it had any connection with the source of fill actually used. Conrad Riemer merely testified that he arrived at the factor of 20% for shrinkage due to compacting by reference to the Murry and Moody (soil engineers) drawing, but this, of course, was after the work was done. There is no evidence that this was discussed initially as part of the contract between Marlis and Riemer. It is to be noted that the purely informational or advisory nature of the notation is shown by the use of the past tense "used," rather than the more directly "use"— indicating that this was a reference to establish the source of the Murry and Moody estimated figure of 32,000 cubic yards of usable fill from the adjacent site—not in any way an agreement with anybody. Thus, neither the nature of the notation nor the location it referred to gave any warrant for using it as part of the contract between Marlis and Riemer. The contract which is in dispute in this case was contained in the letter of June 3, 1973, between Riemer and Marlis and the word "import" clearly indicates it was not made with reference to the adjacent site as a source of fill. It is a separate and independent contract. The notation in question on the soil engineers' drawings, therefore, does not appear to be competent evidence to establish the amount due and owing under the contract between Marlis and Riemer. Yet, this was the basis of Riemer's claim for an additional 20% as indicated by his own testimony:

> "Q. Did you then add a factor to determine the total amount imported?

A. Yes, sir.

Q. What factor did you use?

A. Twenty per cent.

Q. Where did you get the figure, twenty per cent?

A. Off of the engineering drawings.

Q. Are those the plans?

A. Yes, sir.

Q. Showing you Plaintiff's Group Exhibit No. 5, for identification, do you recognize these documents?

A. Yes, sir.

Q. And tell the court what they are.

A. This is the engineer's drawings that I used for the development of the property. They show your existing grades and your finished grades.

Q. And by whom were those plans developed or prepared?

A. Murry and Moody, Consulting Engineers.

Q. And is there anywhere on those plans where the 20 per cent shrinkage factor is located?

A. Yes, sir, on page 2 of 5.

Q. And what does it state?

A. 'Note: shrinkage factors used, 20 percent for Type C, 5 per cent for Type G.' "

Following this testimony defense counsel attempted by cross-examination of the witness, Riemer, to show that there was no proper basis for using the arbitrary 20% shrinkage factor. The upshot of the colloquy between the court and counsel on this point was that the court did not permit counsel to question the propriety of the 20% differential. The court declared it would allow counsel to show that the cross-section measurement used to arrive at the total amount of fill brought in was not a proper method, but, when defense counsel asked to be allowed to show also that the contract between the parties did not contemplate this 20% shrinkage factor, the court replied, "That I have already ruled on, sir."

It is apparent, therefore, that the basis of the judgment was determined by the notation on Murry and Moody's drawing. Yet, as defense counsel attempted to show, this was not a part of the contract. The question involves more than a mere matter of proof. Once the amount of the compacted fill was agreed upon by measurement, the notation in question added by the court's interpretation a new dimension to the contract. Moreover, this was done by extrinsic evidence which because of the court's ruling became a part of the contract itself. This might not have been serious if the evidence of custom and usage in the trade had verified it, but actually, the testimony of Marlis' expert definitely refuted the use of an arbitrary shrinkage factor and Riemer himself admitted on cross-

examination that the compactibility of soil varied from location to location. The use of the 20% factor seems to have rested therefore on Murry and Moody's advisory notation. There does not appear to be any proper basis for such reliance on this evidence in law or in fact.

The judgment of the trial court is therefore reversed and the cause remanded for a new trial.

Reversed and remanded.

T. J. MORAN, P. J., and DIXON, J., concur.